Anthony LOBATO, as an individual and as parent and natural guardian of Taylor Lobato and Alexa Lobato; Denise Lobato, as an individual and as parent and natural guardian of Taylor Lobato and Alexa Lobato; Miguel Cendejas and Yuri Cendejas, individually and as parents and natural guardians of Natalia Cendejas and Salma Cendejas; Pantaleon Villagomez and Maria Villagomez, as individuals and as parents and natural guardians of Chris Villagomez, Monique Villagomez and Angel Villagomez; Linda Warsh, as an individual and as parent and natural guardian of Adam Warsh, Karen Warsh, and Ashley Warsh; Herbert Conboy and Victoria Conboy, as individuals and as parents and natural guardians of Tabitha Conboy, Timothy Conboy and Keila Barish; Terry Hart, as an individual and as parent and natural guardian of Katherine Hart; Larry Howe–Kerr and Anne Kathleen Howe–Kerr, as individuals and as parents and natural guardians of Lauren Howe–Kerr and Luke Howe–Kerr; Jennifer Pate, as an individual and as parent and natural guardian of Ethan Pate, Evelyn Pate and Adeline Pate; Robert L. Podio and Blanche J. Podio, as individuals and as parents and natural guardians of Robert T. Podio and Samantha Podio; Tim Hunt and Sabrina Hunt, as individuals and as parents and natural guardians of Darean Hunt and Jeffrey Hunt; Doug Vondy, as an individual and as parent and natural guardian of Hannah Vondy; Denise Vondy, as an individual and as parent and natural guardian of Hannah and Kyle Leaf; Brad Weisensee and Traci Weisensee, as individuals and as parents and natural guardians of Joseph Weisensee, Anna Weisensee, Amy Weisensee and Elijah Weisensee; Stephen Topping, as an individual and as parent and natural guardian of Michael Topping; Debbie Gould, as an individual and as parent and natural guardian of Hannah Gould, Ben Gould and Daniel Gould; Lillian Leroux Snr, as an individual and as parent and natural guard-

ian of Lillian Leroux III, Ashley Leroux, Alixandra Leroux and Amber Leroux; Theresa Wrangham, as an individual and as parent and natural guardian of Rachel Wrangham; Lisa Calderon, as an individual and as parent and natural guardian of Savannah Smith; Jessica Spangler, as an individual and as parent and natural guardian of Rider Donovan Spangler; Jefferson County School District No. R–1; Colorado Springs School District No. 11, in the County of El Paso; Bethune School District No. R–5; Alamosa School District, No. RE–11J; Centennial School District No. R–1; Center Consolidated School District No. 26JT, of the Counties of Saguache and Rio Grande and Alamosa; Creede Consolidated School District No. 1 in the County of Mineral and State of Colorado; Del Norte Consolidated School District No. C–7; Moffat, School District No. 2, in the County of Saguache and State of Colorado; Monte Vista School District No. C–8; Mountain Valley School District No. RE 1; North Conejos School District No. RE 1J; Sanford, School District No. 6, in the County of Conejos and State of Colorado; Sangre de Cristo School District, No. RE–22J; Sargent School District No. RE–33J; Sierra Grande School District No. R–30; South Conejos School District No. RE10; Aurora Joint School District No. 28 of the Counties of Adams and Arapahoe; Moffat County School District Re: No. 1; Montezuma–Cortez School District No. RE–1; and Pueblo, School District No. 60 in the County of Pueblo and State of Colorado, Plaintiffs–Appellees,

and

Armandina Ortega, individually and as next friend for her minor children, S. Ortega and B. Ortega; Gabriel Guzman, individually and as next friend for his minor children, G. Guzman, Al. Guzman and Ar. Guzman; Robert Pizano, individually and as next friend for his minor children, Ar. Pizano and An. Pizano;

Maria Pina, individually and as next friend for her minor children, Ma. Pina and Mo. Pina; and Martha Lopez, individually and as next friend for her minor children, S. Lopez and L. Lopez, Plaintiffs–Intervenors–Appellees,

v.

The STATE of Colorado; Colorado State Board of Education; Robert K. Hammond, in his official capacity as Commissioner of Education of the State of Colorado; and John Hickenlooper, in his official capacity as Governor of the State of Colorado, Defendants–Appellants.

Supreme Court Case No. 12SA25

Supreme Court of Colorado,
En Banc.

May 28, 2013

Attorneys for Plaintiffs–Appellees: Kathleen J. Gebhardt LLC, Kathleen J. Gebhardt, Jennifer Weiser Bezoza, Boulder, Colorado, Holland & Hart LLP, Marcy G. Glenn, Craig Stewart, Mark B. Wiletsky, Brooke H. McCarthy, Clarissa M. Raney, Denver, Colorado, Halpern Meacham, Alexander Halpern, Boulder, Colorado.

Attorneys for Plaintiffs–Appellees Anthony Lobato, Denise Lobato, Taylor Lobato, Alexa Lobato, Aurora Joint School District No. 28, Jefferson County School District No. R–1, Colorado Springs School District No. 11, Alamosa School District No. RE–11J, and Monte Vista School District No. C–8: Davis Graham

& Stubbs, LLP, Kenzo S. Kawanabe, Terry R. Miller, Denver, Colorado.

Attorneys for Plaintiffs-Appellees Sanford School District 6J, North Conejos School District RE–1J, South Conejos School District RE–10, and Centennial School District No. R–1: Perkins Coie, LLP, Jess A. Dance, Zane Gilmer, Denver, Colorado.

Attorneys for Plaintiffs–Appellees Alixandra, Amber, Ashley, Lillian III, and Lillian Leroux Sr.: Snell & Wilmer LLP, Jessica E. Yates, Denver, Colorado.

Attorneys for Plaintiffs–Appellees Creede Consolidated School District No. 1 in the County of Mineral and State of Colorado; Del Norte Consolidated School District No. C–7; Moffat, School District No. 2, in the County Saguache and State of Colorado, and Mountain Valley School District No. RE 1: University of Denver, Sturm College of Law, Kyle C. Velte, Denver, Colorado.

Attorneys for Plaintiffs–Intervenors–Appellees: Bryan Cave HRO, Manuel L. Martinez, Steven J. Perfrement, Denver, Colorado, Mexican American Legal Defense & Educational Fund (MALDEF), David G. Hinojosa, Marisa Bono, Rebecca M. Couto, San Antonio, Texas.

Attorneys for Defendants–Appellants: John W. Suthers, Attorney General, Daniel D. Domenico, Solicitor General, Jonathan P. Fero, Assistant Solicitor General, John T. Lee, Assistant Attorney General, Erica Weston, Assistant Attorney General, Carey Taylor Markel, Special Assistant Attorney General, Denver, Colorado.

Attorneys for Amici Curiae The Colorado Union of Taxpayers and The Tabor Foundation: Rebecca R. Sopkin, Lakewood, Colorado.

Attorneys for Amicus Curiae Colorado Education Association: Martha R. Houser, Bradley Bartels, Denver, Colorado.

Attorneys for Amici Curiae Great Education Colorado, Colorado Parent-Teachers Association, and Colorado Association of Gifted and Talented: The Harris Law Firm, P.C., John H. Tatlock, Denver, Colorado.

Attorneys for Amici Curiae Colorado Behavioral Healthcare Council and Alliance: Hale Westfall, LLP, Richard Allen Westfall, Peter Krumholz, Matthew W. Spengler, Denver, Colorado.

Attorneys for Amici Curiae The Bell Policy Center and American Civil Liberties Union of Colorado: Faegre Baker Daniels LLP, David W. Stark, Denver, Colorado.

Attorneys for Amici Curiae Colorado Boards of Cooperative Educational Services Association, Colorado Rural Schools Caucus, and Rural School and Community Trust: Kaplan Kirsch & Rockwell LLP, John E. Putnam, Lala T. Wu, Denver, Colorado.

Attorneys for Amici Curiae Brennan Center for Justice and Professors of Constitutional Law and Civil Procedure: Melissa Hart, Boulder, Colorado, Alicia L. Bannon, New York, New York.

Attorneys for Amicus Curiae Campaign for Educational Equity at Teachers College, Columbia University and the National Educational Access Network: Blain Myhre LLC, Blain Myhre, Englewood, Colorado, Michael A. Rebell, New York, New York.

Attorneys for Amicus Curiae Colorado Women's Bar Association: Patricia M. Jarzobski, P.C., Patricia M. Jarzobski, Denver, Colorado.

Attorneys for Amicus Curiae Colorado Hispanic Bar Association: Winter L. Torres, Denver, Colorado.

Attorneys for Amicus Curiae Colorado Lawyers Committee: Elkind Alterman Hartson PC, Nancy Elkind, Denver, Colorado.

Attorneys for Amicus Curiae Colorado Gay Lesbian Bisexual Transgendered Bar Association: The Harris Law Firm, P.C., J. Ryann Payton, Denver, Colorado.

Attorneys for Amicus Curiae Colorado Center on Law and Policy: James W. Hubbell, Denver, Colorado.

Attorneys for Amici Curiae Colorado Association of School Boards and Colorado Association of School Executives: Kathleen Sullivan, Elizabeth R. Friel, Denver, Colorado.

Attorneys for Amici Curiae Colorado Concern, Colorado Hospital Association, Denver Metro Chamber of Commerce, Colorado Contractors Association, Colorado Competi-

tive Council, Colorado Association of Commerce and Industry, Progressive 15, Colorado Mining Association, Colorado Association of Mechanical and Plumbing Contractors, Colorado Bankers Association, Colorado Association of Health Plans, Denver South Economic Development Partnership, National Federation of Independent Business, Associated General Contractors of Colorado: Brownstein Hyatt Farber Schreck, LLP, Jason R. Dunn, Michael D. Hoke, Denver, Colorado.

Attorneys for Amici Curiae Colorado Cross-Disability Coalition, The Legal Center for People with Disabilities and Older People, and The Arc of Colorado: Heizer Paul Grueskin LLP, Edward T. Ramey, Lila M. Bateman, Denver, Colorado.

Attorneys for Amicus Curiae The Regents of the University of Colorado: Office of University Counsel, Patrick T. O'Rourke, Jeremy Hueth, Denver, Colorado.

Attorneys for Amicus Curiae Education Justice at Education Law Center: Heizer Paul Grueskin LLP, Martha M. Tierney, Denver, Colorado, Lowenstein Sandler PC, Stephen R. Buckingham, Roseland, New Jersey.

Attorneys for Amici Curiae Former Colorado Governors Bill Ritter, Bill Owens, and Richard Lamm: Foster Graham Milstein & Calisher, LLP, David Wm. Foster, Chip G. Schoneberger, Denver, Colorado.

Attorneys for Amici Curiae Colorado League of Charter Schools and National Alliance for Public Charter Schools: Kutz & Bethke LLC, William P. Bethke, Lakewood, Colorado.

Attorneys for Amici Curiae Kim Reorganized School District 88, Lake County School District R-1, Limon Public School District RE-4J District: Lyons Gaddis Kahn & Hall, PC, Catherine A. Tallerico, Longmont, Colorado, Matthew D. Samelson, Boulder, Colorado.

Attorneys for Amici Curiae Padres Unidos and Colorado Association for Bilingual Education: Padres Unidos, Inc., Winter L. Torres, Denver, Colorado.

Justice RICE delivered the Opinion of the Court.

¶ 1 The public school financing system enacted by the General Assembly complies with the Colorado Constitution. It is rationally related to the constitutional mandate that the General Assembly provide a "thorough and uniform" system of public education. Colo. Const. art. IX, § 2 (the "Education Clause"). It also affords local school districts control over locally-raised funds and therefore over "instruction in the public schools." Colo. Const. art. IX, § 15 (the "Local Control Clause"). As such, the trial court erred when it declared the public school financing system unconstitutional. We accordingly reverse.

## I. Facts and Procedural History

¶ 2 Respondent Plaintiffs, Anthony Lobato, et al. (the "Plaintiffs"), initiated this action for declaratory and injunctive relief in 2005. They claimed that the current public school financing system violates the Education Clause because the system fails to provide sufficient funding to support a "thorough and uniform" system of free public schools. Plaintiffs also claimed that local school districts' lack of sufficient financial resources, coupled with the public school financing system's restrictions on spending, prevents the districts from exerting meaningful control over educational instruction and quality in violation of the Local Control Clause.

¶ 3 Petitioner Defendants, the State of Colorado, et al. (the "Defendants"), moved to dismiss the complaint. Without taking evidence, the trial court granted the Defendants' motion to dismiss on both standing and non-justiciable political question grounds. Plaintiffs appealed the trial court's ruling to the court of appeals. The court of appeals affirmed the trial court's standing and political question conclusions and upheld the trial court's decision to dismiss Plaintiffs' complaint. *Lobato v. State,* 216 P.3d 29, 32 (Colo.App.2008). Plaintiffs petitioned this Court for certiorari review of the standing and political question issues.

¶ 4 We granted certiorari and reversed the court of appeals. *Lobato v. State,* 218 P.3d 358, 364 (Colo.2008) ("*Lobato I*").As a thresh-

old matter, we declined to address the constitutional standing question related to the plaintiff school districts because the Court had subject matter jurisdiction to hear the case on account of the undisputed standing of the plaintiff parents. *Id.* at 367–68.

¶ 5 With respect to the political question issue, the Court interpreted its decision in *Lujan v. Colorado State Board of Education,* 649 P.2d 1005 (Colo.1982), and held that Plaintiffs presented a justiciable claim because "determin[ing] whether the state's public school financing system is rationally related to the constitutional mandate that the General Assembly provide a 'thorough and uniform' system of public education" does not "unduly infringe[e] on the legislature's policy-making authority." *Lobato I,* 218 P.3d at 363. Having decided the standing and justiciability issues, we remanded the case to the court of appeals with instructions to remand to the trial court to provide the Plaintiffs an opportunity to prove their allegations. *Id.* at 364.

¶ 6 The case proceeded to trial. Plaintiffs and Defendants presented extensive evidence addressing the constitutionality of the public school financing system. Adopting the Plaintiffs' proposed findings of fact and conclusions of law almost verbatim, the trial court held that Colorado's current public school financing system is not rationally related to the General Assembly's constitutional mandate to provide a "thorough and uniform" system of free public schools. The trial court also held that the "irrational" public school financing system violates the Local Control Clause because it deprives individual school districts of the opportunity to implement the Education Clause's "thorough and uniform" mandate. Accordingly, the trial court enjoined Defendants from continuing to execute the current public school financing system. The trial court stayed enforcement of this injunction to provide the state reasonable time to create and implement a system of public school financing that complies with the Colorado Constitution.

¶ 7 Defendants appealed the trial court's order directly to this Court pursuant to section 13–4–102(1)(b), C.R.S. (2012). This appeal presents three issues for our review: (1) whether the Plaintiffs' claims present a non-justiciable political question; (2) whether the public school financing system satisfies the rational basis test articulated in *Lobato I* and therefore complies with the Education Clause; and (3) whether the public school financing system is constitutional under the Local Control Clause.

## II. Analysis

¶ 8 As a threshold matter, and consistent with this Court's decision in Lobato I, we hold that Plaintiffs' claims are justiciable. Addressing the substance of this appeal, we hold that the current public school financing system is rationally related to the constitutional mandate that the General Assembly provide a "thorough and uniform" system of public education. We also hold that the dual-funded public school financing system complies with the Local Control Clause because it affords local school districts control over locally-raised funds and therefore over "instruction in the public schools." As such, the trial court reversibly erred when it declared the public school financing system unconstitutional.

¶ 9 We first describe this Court's jurisdiction and the applicable standard of review. We then discuss the three substantive issues in turn.

### A. Jurisdiction and Standard of Review

¶ 10 The court of appeals typically maintains "initial jurisdiction over appeals from final judgments of ... the district courts." § 13–4–102(1). We invoke our jurisdiction over this direct appeal, however, because the trial court declared the statutes that delineate the public school financing system unconstitutional. § 13–4–102(1)(b); *see Town of Telluride v. San Miguel Valley Corp.,* 185 P.3d 161, 164 (Colo.2008) ("We review the judgment of the district court pursuant to our jurisdiction over cases in which a statute has been declared unconstitutional, as set forth in section 13–4–102(1)(b)[.]").

¶ 11 This case requires us to interpret relevant portions of the Colorado Constitution, assess the trial court's application of the

rational basis test stated in *Lobato I*, and review the trial court's legal conclusion that the state public school financing system is unconstitutional. We review these questions of law de novo. *Freedom Colo. Info., Inc. v. El Paso Cnty. Sheriff's Dep't*, 196 P.3d 892, 897 (Colo.2008); *Colo. Dep't of Revenue v. Garner*, 66 P.3d 106, 109 (Colo.2003).

## B. Justiciability

¶ 12 The questions presented in this appeal are justiciable pursuant to the law of the case doctrine. *Giampapa v. Am. Family Mut. Ins. Co.*, 64 P.3d 230, 243 (Colo. 2003) (describing law of the case doctrine); *see Lobato I*, 218 P.3d at 363. This Court will generally adhere to a prior ruling on a question of law that it made at an earlier stage of the same litigation. *Giampapa*, 64 P.3d at 243. We have discretion, however, to deviate from this "law of the case" principle if we determine that the prior ruling at issue is no longer sound because of changed conditions, factual errors, intervening changes in the law, or resulting manifest injustice. *See People of the City of Aurora, ex rel. State v. Allen*, 885 P.2d 207, 212 (Colo.1994) (describing the exceptions to law of the case doctrine).

¶ 13 This Court held in *Lobato I* that the Plaintiffs' claims were justiciable. *Lobato I*, 218 P.3d at 368. We perceive no changed conditions, factual errors, intervening changes in the law, or evidence of manifest injustice that might call this prior ruling into question. Thus, we refuse to reconsider the justiciability issue and instead adhere to *Lobato I* as the law of the case. We now consider the substance of the justiciable issues that constitute the heart of this appeal.

## C. The Public School Financing System is Rationally Related to the "Thorough and Uniform" Mandate

¶ 14 The Education Clause of the Colorado Constitution directs the General Assembly to "provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state." Colo. Const. art. IX, § 2. This mandate requires the General Assembly to enact education policy that furnishes a "thorough and uniform" free education to "all residents of the state, between the ages of six and twenty-one years." *Id.* We held in *Lobato I* that the legislative scheme that makes up Colorado's public school financing system must be "rationally related to the constitutional mandate that the General Assembly provide a 'thorough and uniform' system of public education" to comply with the Education Clause. 218 P.3d at 363.

¶ 15 Despite articulating this custom-tailored rational basis test, this Court did not expressly interpret the Education Clause or define the phrase "thorough and uniform" in *Lobato I*. Therefore, before addressing the public school financing system, we interpret the plain meaning of "thorough and uniform" as it appears in the Education Clause. We then briefly discuss the unique type of rational basis review set out in *Lobato I* in light of our definition of "thorough and uniform." Finally, we apply the *Lobato I* test and conclude that the public school financing system is "rationally related to the constitutional mandate that the General Assembly provide a 'thorough and uniform' system of public education." *See id.*

### 1. Thorough and Uniform

¶ 16 We hold that the phrase "thorough and uniform" in the Education Clause describes a free public school system that is of a quality marked by completeness, is comprehensive, and is consistent across the state.

¶ 17 The Colorado Constitution tasks the judicial branch with construing the meaning of constitutional language. *See* Colo. Const. art. VI, § 1. "In giving effect to a constitutional provision, we employ the same set of construction rules applicable to statutes." *Danielson v. Dennis*, 139 P.3d 688, 691 (Colo.2006). We begin by giving the relevant constitutional terms "their plain and commonsense meaning." *Id.* (citing *Bd. of Cnty. Comm'rs v. Vail Assocs., Inc.*, 19 P.3d 1263, 1273 (Colo.2001)). We also read the applicable constitutional provisions as a whole. *Id.*

¶ 18 Although this Court has discussed the "thorough and uniform" mandate on many occasions, we have not explicitly interpreted

the phrase "thorough and uniform." Therefore, we review the plain and commonsense meaning of the words "thorough" and "uniform" in the context of the Education Clause to reach our interpretation. The adjective "thorough" commonly refers to something of a quality that is "marked by completeness." *Webster's Third New International Dictionary* 2380 (1971). It also refers to something that is "marked by attention to many details," or is, in other words, comprehensive. *Id.* The term "uniform" connotes something that is characterized "by a lack of variation, diversity, [or] change in form" or that is "consistent ... in character." *Id.* at 2498. Thus, a "thorough and uniform" system of public education is of a quality marked by completeness, is comprehensive, and is consistent across the state.

¶ 19 Reading the "thorough and uniform" mandate in context supports our plain language construction. First, the Education Clause requires the state to provide public school opportunities to "all residents of the state, between the ages of six and twenty-one years." Colo. Const. art. IX, § 2. This language supports our interpretation of "thorough and uniform" because a public school system that serves all Colorado residents between the ages of six and twenty-one is of a quality marked by completeness, is comprehensive, and is consistent across the state by providing educational opportunities to all Colorado residents within a broad age-range. In addition, the Education Clause provides that "[o]ne or more public schools" be open "at least three months in each year" in each school district to receive state funding. *Id.* This minimal requirement also supports our interpretation of the phrase "thorough and uniform" because it, together with the "thorough and uniform" mandate, simply establishes the constitutional floor upon which the General Assembly must build its education policy.

¶ 20 Our interpretation of "thorough and uniform" is consistent with this Court's previous treatment of the "thorough and uniform" mandate. For example, instead of affirmatively defining "through and uniform" in *Lujan*, this Court described what a "thorough and uniform" system of public schools

does not require. 649 P.2d at 1024–25. The Court held that the "thorough and uniform" mandate does not necessitate "absolute equality in educational services or expenditures," nor does it direct "the General Assembly [to] establish a central public school finance system restricting each school district to equal expenditures per student." *Id.* at 1017–18. Furthermore, the *Lujan* Court noted that " 'thorough and uniform' does not require complete equality in the sense of providing free textbooks to all students." *Id.* (citing *Marshall v. Sch. Dist. RE # 3 Morgan Cnty.*, 191 Colo. 451, 553 P.2d 784 (1976)). Our interpretation of "thorough and uniform" is consistent with the exclusions described in *Lujan* because providing a public school system that is of a quality marked by completeness, is comprehensive, and is consistent across the state does not demand absolute equality in the state's provision of educational services, supplies, or expenditures.

¶ 21 Having defined the phrase "thorough and uniform," we now discuss the rational basis test delineated in *Lobato I*.

### 2. The *Lobato I* Rational Basis Test

¶ 22 This Court held in *Lobato I* that the judiciary must "determine whether the state's public school financing system is rationally related to the constitutional mandate that the General Assembly provide a 'thorough and uniform' system of public education." 218 P.3d at 363. Inserting our interpretation of "thorough and uniform" into this test and clarifying the meaning of "rationally related" in this unique context, we hold that Colorado's public school financing system is rationally related to the "thorough and uniform" mandate of the Education Clause if it funds a public school system that is of a quality marked by completeness, is comprehensive, and is consistent across the state.

¶ 23 As this Court stated in *Lobato I*, our custom-tailored form of rational basis review "satisfies the judiciary's obligation to evaluate the constitutionality of the state's public school financing system without unduly infringing on the legislature's policy-making authority." *Id.* In applying this test

to the public school financing system, our task is not to determine " 'whether a better financing system could be devised,' " but rather to determine "whether the system passes constitutional muster." *Id.* (quoting *Lujan,* 649 P.2d at 1025). We presume that the statutes that make up the public school financing system are constitutional, and we will uphold the legislation unless the Plaintiffs have proven beyond a reasonable doubt that the statutes fail to pass the *Lobato I* rational basis test, and are therefore unconstitutional. *See Owens v. Colo. Cong. of Parents, Teachers & Students,* 92 P.3d 933, 942 (Colo.2004).

### 3. Application

¶ 24 The current public school financing system is rationally related to the "thorough and uniform" mandate because it funds a system of free public schools that is of a quality marked by completeness, is comprehensive, and is consistent across the state. Therefore, the financing system satisfies the *Lobato I* rational basis test and complies with the Education Clause. We describe the basic components of the public school financing system and then analyze its rational relationship to the "thorough and uniform" mandate in the following subsections.

#### a. Colorado's Public School Financing System

¶ 25 The public school financing system combines local taxes, state appropriations, and federal monies to fund the statewide standards-based public education system. The Public School Financing Act of 1994 ("PSFA") governs the majority of state and local funding for education. §§ 22–54–101 to –135, C.R.S. (2012). The PSFA sets out a uniform per-pupil formula that the state uses to calculate the amount of education funding each school district shall receive in a given year. § 22–54–104(1)(a); *see, e.g.,* § 22–54–104(5)(XIX). This formula requires the state to multiply a statutory per-pupil base level of funding by the number of students enrolled in the subject school district. § 22–54–104(1)(a). The state then adjusts the resulting product to account for district-specific "factors" such as personnel costs, cost of living, concentrations of at-risk students, on-line education enrollment, and the number of fifth-year high school pupils enrolled in the district. § 22–54–104(2)–(4). The money each school district receives as a result of these calculations is called the district's "total program." § 22–54–104(1)(a). In response to the reality of statewide budget reductions in recent years, the state now uniformly reduces each district's total program by a "negative factor" that reflects statewide funding cuts. § 22–54–104(5)(g)(1).

¶ 26 The PSFA also defines the contours of the dual-funded public school financing system by describing the sources of revenue needed to ensure that each school district receives its total program. The "local share" of a school district's total program consists of proceeds from a mill levy upon the assessed valuation of the taxable property within a school district's boundaries and, to a lesser degree, a "specific ownership tax." *See* § 22–54–106(1)(a)(I). Although the statutes restrict the amount of money school districts may raise using mill levies, *see* § 22–54–106(2)(a), the PSFA permits school districts to supplement their total programs with additional local revenues by asking their electorates to approve additional mill levies for education purposes, *see* § 22–54–108. This supplemental form of local revenue for education is known as a "mill levy override." *See id.*

¶ 27 The "state share" of a school district's allocated funding is derived by subtracting the district's "local share" from its total program. § 22–54–106(1)(b)(I). The money for each school district's "state share" comes from the state general fund, the Education Fund, and from a portion of the rents generated by state school lands and federal mineral leases. *See* § 22–55–105, C.R.S. (2012) (general fund appropriation requirements for education).

¶ 28 In addition to the total program funding provided by the PSFA, the public school financing system provides "categorical" funding to serve particular groups of students and particular student needs. § 22–55–102(4), C.R.S. (2012) (defining "categorical programs"); § 22–55–107, C.R.S. (2012) (describing funding for categorical programs).

For example, categorical funding is available for English language learners, at-risk students, and disabled children. § 22–55–102(4). The system also permits school districts to contract bonded indebtedness for education-related capital improvements or construction with voter approval. § 22–42–102(2)(a), C.R.S. (2012).

### b. The System is Rationally Related to the "Thorough and Uniform" Mandate

¶ 29 The public school financing system is rationally related to the "thorough and uniform" mandate because it funds a system of free public schools that is of a quality marked by completeness, is comprehensive, and is consistent across the state. It does so using a multi-faceted statutory approach that applies uniformly to all of the school districts in Colorado.

¶ 30 The primary component of the public school finance system, the PSFA, uses a standard formula that incorporates enrollment numbers, a per-pupil base amount of money, and applicable statutory factors to calculate an amount of money each district will receive in a given year from a combination of state and local sources. By supplying the single statutory framework whereby the state may calculate every district's total program, and by describing the sources of state and local revenue that make up the calculated amounts, the PSFA applies uniformly to all of Colorado's school districts and serves as the cornerstone of a public school financing system that funds a public education system that is of a quality marked by completeness, is comprehensive, and is consistent across the state.

¶ 31 In addition, the public school financing system's "categorical" funding for particular groups of students—for example, English language learners, at-risk students, and children with disabilities—also contributes to the public school financing system's rational relationship to the "thorough and uniform" mandate. Categorical funding allocates money beyond the base PSFA amount for children that require supplemental resources. It therefore assists in providing every child in Colorado, including children with greater needs than the general student population, with educational opportunities. Thus, categorical funding contributes to the public school financing system's rational relationship to the "thorough and uniform" mandate by helping fund a statewide public school system that is more complete and comprehensive.

¶ 32 Furthermore, the public school financing system provides a mechanism—contracting for bonded indebtedness—whereby individual school districts may ask their constituents to fund capital improvements or the construction of new school facilities. This mechanism contributes to the rational relationship between the public school financing system and the "thorough and uniform" mandate because bonded indebtedness gives local school districts the authority to generate funding for capital improvements that help facilitate the implementation of a public school system that is of a quality marked by completeness, is comprehensive, and is consistent across the state.

¶ 33 In sum, our de novo review of the relevant legislation reveals that the public school financing system is rationally related to the "thorough and uniform" mandate. The Plaintiffs did not establish beyond a reasonable doubt that the system fails to pass constitutional muster under the *Lobato I* rational basis test. While we sympathize with the Plaintiffs and recognize that the public school financing system might not provide an optimal amount of money to the public schools, the statutory public school financing system itself is constitutional. Accordingly, we reverse the trial court's holding that "the entire system of public school financing is not rationally related to the mandate of the Education Clause."

### D. Local Control

¶ 34 The dual-funded public school financing system complies with the Local Control Clause because it affords local school districts control over locally-raised funds and therefore over "instruction in the public schools."

¶ 35 We presume that the statutes that make up the public school financing system

are constitutional, and we will uphold the legislation unless the Plaintiffs have proven the statutes are unconstitutional beyond a reasonable doubt. *See Owens*, 92 P.3d at 942. The Local Control Clause limits the state's power over instruction in each district's public schools. To determine whether the dual-funded public school financing system complies with the Local Control Clause, we analyze whether that system affords local school districts control over locally-raised funds and therefore over "instruction in the public schools." *Id.* at 935.

¶ 36 We first describe the historic importance of local control to Colorado's public education system, and highlight the role that local control plays in the constitutionality of dual-funded state programs. We then discuss how this Court applied local control principles in *Lujan*, 649 P.2d at 1022–24, and *Owens*, 92 P.3d at 942–44. Finally, we assess the public school financing system within this legal framework and conclude that it is constitutional under the Local Control Clause.

### 1. Local Control Principles and Precedent

¶ 37 The Local Control Clause of the Colorado Constitution provides:

> The general assembly shall, by law, provide for organization of school districts of convenient size, in each of which shall be established a board of education, to consist of three or more directors to be elected by the qualified electors of the district. *Said directors shall have control of instruction in the public schools of their respective districts.*

Colo. Const. art. IX, § 15 (emphasis added).

¶ 38 " '[T]he historical development of public education in Colorado has been centered on the philosophy of local control' " due to the freedom and flexibility local control provides. *Owens*, 92 P.3d at 941 (quoting *Lujan*, 649 P.2d at 1021). "The use of local taxes affords a school district the freedom to devote more money toward educating its children than is otherwise available in the state-guaranteed minimum amount." *Lujan*, 649 P.2d at 1023. Prioritizing local control "also enables the local citizenry greater influence and participation in the decision making pro-

cess as to how the[ir] local tax dollars are spent. Some communities might place heavy emphasis on schools, while others may desire greater police or fire protection, or improved streets or public transportation." *Id.; see Owens*, 92 P.3d at 941 ("Allowing a district to raise and disburse its own funds enables the district to determine its own education policy, free from restrictions imposed by the state or any other entity."). Furthermore, "local control provides each district with the opportunity for experimentation, innovation, and a healthy competition for educational excellence." *Lujan*, 649 P.2d at 1023. Thus, the question of whether the General Assembly has afforded school districts local control over instruction in the public schools plays a crucial role in this Court's constitutionality analysis of public school financing legislation.

¶ 39 This Court recently discussed the importance of local control to the modern dual-funded public school financing system during its review of the 2007 amendments to the PSFA. *See Mesa Cnty. Bd. of Cnty. Comm'rs v. State*, 203 P.3d 519, 527–30 (Colo.2009). Referring to dual-funded state programs dating back to the Great Depression, the Court reiterated its long-standing conclusion that a "state can require the local government to pay its statutorily mandated share under a dual funding formula," so long as the local entity remains "responsible for imposing, collecting and expending local property taxes." *Id.* at 528 (citation omitted).

¶ 40 Reflecting the Court's propensity to uphold dual-funded programs that comply with this principle, the *Lujan* Court held during its equal protection analysis that an earlier version of the PSFA was "constitutional as rationally related to [the] legitimate state purpose" of promoting local control over instruction because "utilizing local property taxation to partly finance Colorado's schools is rationally related to effectuating local control over public schools." 649 P.2d at 1023. Although the Court recognized that "due to disparities in wealth, the present finance system can lead to the low-wealth district having less fiscal control than wealthier districts," it also held that "this result, by itself, does not strike down the entire school

finance system" under the equal protection rational basis standard. *Id.*

¶ 41 Unlike its decision to uphold the PSFA on equal protection grounds in *Lujan,* this Court held in *Owens* that a statewide pilot program violated the Local Control Clause. 92 P.3d at 944. The pilot program essentially required school districts to pay the parents of eligible children locally-raised funds to cover the costs for those children to attend nonpublic schools. *Id.* at 943. In concluding that the pilot program was unconstitutional, the Court reiterated that local "control over instruction requires the local boards to retain substantial discretion 'as to the character of ... instruction ... pupils shall receive *at the cost of the district.*'" *Id.* (quoting *Bd. of Educ. of Sch. Dist. No. 1 in City & Cnty. of Denver v. Booth,* 984 P.2d 639, 648 (Colo.1999) (internal quotation omitted)). It also emphasized that local "control over instruction is inextricably linked to control over locally-raised funds," *id.* at 941, and reasoned that by affirmatively depriving the school districts of control over their locally-raised funds, the General Assembly deprived those districts of local control over instruction in their public schools. *Id.* at 942–43. In essence, then, a dual-funded public school financing system is constitutional so long as it allows the local districts to retain control over how they spend locally-generated tax revenue. *See Mesa Cnty.,* 203 P.3d at 527–30.

### 2. Application

¶ 42 The dual-funded public school financing system at issue in this case complies with the Local Control Clause because it affords local school districts control over locally-raised funds and therefore over instruction in the public schools. As it did when this Court decided *Lujan* and *Mesa County,* the PSFA permissibly requires that the money comprising the total program for each school district in a given year come from a combination of state and local revenues, with the local districts retaining responsibility for imposing, collecting, and expending local property taxes collected for education purposes. *See* § 22–54–106.

¶ 43 Unlike the unconstitutional pilot program in *Owens,* however, the public school financing system does not affirmatively require school districts to use their locally-raised revenue in any particular manner. Even if school districts use a substantial portion of their locally-raised funds to help their students achieve state standards—as the trial court found they do—nothing in the public school financing system itself requires a particular allocation of local funds.

¶ 44 The system also provides mill levy override and bonded indebtedness mechanisms which authorize school districts to raise additional revenue beyond their total programs. These mechanisms afford school districts the opportunity to exert additional local control over instruction by generating and using supplemental local funds. While we recognize that "disparities in wealth" may impair a low-wealth district's ability to pass mill levy overrides and bonded indebtedness, such a "result, by itself, does not strike down the entire school finance system" on Local Control grounds, just as the same result did not strike down the entire school finance system for equal protection purposes in *Lujan.* 649 P.2d at 1023 (citations omitted). Therefore, the public school financing system does not unconstitutionally usurp local control over instruction in the public schools. Instead, it affords local school districts control over locally-raised funds, and therefore over "instruction in the public schools," by providing a dual-funded financing regime that refrains from affirmatively directing school districts to use their locally-raised revenues in any particular fashion. *See Mesa Cnty.,* 203 P.3d at 530; *Owens,* 92 P.3d at 943. While we do not dispute that public education in Colorado would benefit from additional funding, the local control built into the public school financing system "provides each district with the opportunity for experimentation [and] innovation" in using limited resources to achieve educational excellence. *Lujan,* 649 P.2d at 1023. The public school financing system is therefore constitutional under the Local Control Clause.

### III. Conclusion

¶ 45 We have held that "courts must avoid making decisions that are intrinsically legis-

lative. It is not up to the court to make policy or to weigh policy." *Town of Telluride v. Lot Thirty–Four Venture, L.L.C.*, 3 P.3d 30, 38 (Colo.2000); *see also Lobato I*, 218 P.3d at 381 (Rice, J., dissenting). While the trial court's detailed findings of fact demonstrate that the current public school financing system might not be ideal policy, this Court's task is not to determine " 'whether a better financing system could be devised, but rather to determine whether the system passes constitutional muster.' " *Lobato I*, 218 P.3d at 374 (quoting *Lujan*, 649 P.2d at 1025) (internal citation omitted).

¶ 46 Our holding today that the current public school financing system complies with the Education and Local Control Clauses of the Colorado Constitution satisfies this Court's duty "to say what the law is," *see Marbury v. Madison*, 5 U.S. 137, 177, 1 Cranch 137, 2 L.Ed. 60 (1803), without unduly infringing upon the policy-making power of the General Assembly. It thereby affords the General Assembly an opportunity to reform Colorado's education policy, including the public school financing system, consistent with this opinion.

¶ 47 Chief Justice BENDER dissents, and Justice HOBBS joins in the dissent.

¶ 48 Justice HOBBS dissents, and Chief Justice BENDER joins in the dissent.

Justice MÁRQUEZ does not participate.

Chief Justice BENDER, dissenting.

¶ 49 Today, the majority abdicates this court's responsibility to give meaningful effect to the Education Clause's guarantee that all Colorado students receive a thorough and uniform education. In my view, a thorough and uniform system of education must include the availability of qualified teachers, up-to-date textbooks, access to modern technology, and safe and healthy facilities in which to learn. The record, however, reveals an education system that is fundamentally broken. It is plagued by underfunding and marked by gross funding disparities among districts. Colorado's school-age population has exploded, with dramatic increases in the number of Hispanic students, low-income students, English language learners, and students with special needs. The General Assembly has failed to recognize these changes and to fund the increased costs necessary to educate these children. Colorado's education system is, beyond any reasonable doubt, neither thorough nor uniform. I would hold that Colorado's method for financing public education is not rationally related to the General Assembly's affirmative duty to provide and to maintain a thorough and uniform system of free public schools. This affirmative obligation requires the General Assembly to implement a finance system that provides Colorado's students the education system to which they are constitutionally entitled. Hence, I respectfully dissent.

**I.**

¶ 50 Since statehood, the Colorado Constitution has required the General Assembly to "provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state." Colo. Const. art. IX, § 2. This Education Clause reflected the framers' deeply held belief that an educated citizenry was essential to Colorado's success as a democratic society and as a state. Professor Tom Romero, an expert in Colorado constitutional history, testified that one of the provision's authors stated that the Education Clause was intended to "erect a superstructure upon a solid footing and lasting foundation, a system of education as high as our snowcapped mountains, as broad as our boundless prairies, and as free to all as the air of heaven."

¶ 51 Then, as now, this affirmative constitutional right to public education in Colorado is of paramount importance.[1] Education is required for exercising our most basic civic responsibilities. "It is the very foundation of good citizenship." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Education provides our youth with the skills and knowledge necessary to be productive members of society and to be competitive in our modern, global economy.

---

1. *See Lobato v. State,* 218 P.3d 358, 371 (Colo. 2009) (*"Lobato I "*)(discussing affirmative constitutional rights as those "that the government must secure for its citizens").

"[I]t is doubtful that any child may reasonably be expected to succeed in life if he [or she] is denied the opportunity of an education." *Id.* The Colorado Department of Education's "vision statement" echoes these concerns: "All students in Colorado will become educated and productive citizens capable of succeeding in a globally competitive workforce."

¶ 52 These aspirational sentiments, however, do not correspond to the reality of public education in Colorado at the time of trial in August 2011. The following facts are taken from the extensive record of that 25–day trial—during which more than 80 witnesses testified, more than 2,000 exhibits were admitted, and almost 7,000 pages of transcribed testimony were produced—and from the trial court's 183–page order summarizing this record. On appeal, the defendants do not contest these facts.

¶ 53 Since the late 1970s, education funding in Colorado has been in steady decline:

Source: Ex. 10429

Cary Kennedy, former treasurer for the State of Colorado, laid the foundation for admission of the above exhibit. Kennedy testified that, although the graph represented the most up-to-date data then available, Colorado has continued to make "significant cuts in education funding since 2008."

¶ 54 Colorado is one of the wealthiest states in the nation, but it ranks 49th in the country in per-pupil spending per $1,000 of personal income. Colorado ranks 45th in the country for the amount of taxable resources dedicated to public education. In one national study, Colorado received an "F" for funding "effort"—a measure of whether a state takes advantage of its fiscal capacity to fund public education—because Colorado spends such a small percentage of its gross state product on public schools. By almost any measure, Colorado ranks in the bottom third nationally in education spending.

¶ 55 And the cost of educating Colorado's changing population continues to increase. Colorado's population of students requiring more expensive education services—such as English language learners (ELL), low-income children, and special education students—has exploded. Since 1995, Colorado's ELL population has grown 250%. In some districts, the ELL population has grown by as much as 800% in the last decade. Colorado has the fastest growing rate of childhood poverty in the nation. Across the state, 30% of students are eligible for the federal free lunch program. In the last 20 years, the percentage of "majority low income" schools has risen from 7% to 25%. In Cherry Creek School District, assistant superintendent Eliot Asp testified that nearly 30% of his stu-

dents are living below poverty level. The number of special education students continues to increase, as does the cost of educating them.

¶ 56 Meanwhile, the General Assembly continues to promulgate new education standards. These standards require all Colorado students to attain proficiency in a broad range of subjects and be ready for postsecondary education or entry into the "twenty-first-century workforce" by graduation. They stress "information technology application" and other modern skills. To conform to these new standards, school districts must develop updated curricula, buy new instructional materials, train teachers, and have access to modern technology. Monte Moses, the former deputy superintendent of the Cherry Creek School District, testified that his district's ability to serve its students had been "compromised dramatically" by the state's implementation of unfunded education standards. He testified that these standards require more funding, but the General Assembly has provided school districts with less.

¶ 57 These historical developments have not occurred in a vacuum. Student performance rates continue to decline. Colorado ranks 46th in the nation in the rate of high school completion. For those students who do graduate high school, 29% are not college-ready, meaning they must take remedial classes before taking college-level courses. In some districts, over 50% of students are not college-ready by graduation. According to Lieutenant Governor Joe Garcia, who testified as an expert in Colorado education policy, these percentages significantly increase for African–American and Hispanic students and for low-income students. White students are 36% more likely to complete college than Hispanic students. This is the largest "degree attainment gap" in the country and twice the national average. Additional funding is required to close these achievement gaps, but, according to John Barry, superintendent of Aurora Public Schools, "we have been on a steady decline on our resources available to move student achievement and close the achievement gap." Despite these gaps, Colorado boasts one of the most college-educated populations in the country, but most of Colorado's college graduates are from other states. According to former state Senator Keith King, this "Colorado Paradox" shows that Colorado has not prepared its own students for college. Dr. Steven Murdock, an expert in demographics, stated the problem in stark terms: "[W]e're looking at the potential for Colorado to be a poorer and less competitive state in the future than it is today."

¶ 58 This failure to educate our students has real economic and social costs. Every year, about 11,500 Colorado students drop out of high school. In some districts, Hispanic students drop out at a rate of over 50%. Studies show that high school dropouts pay fewer taxes, have higher health care costs, and are more likely to engage in criminal activity. Taking these factors into account, they result in an economic burden to the state, by conservative estimates, of $6 billion. By contrast, each college graduate represents a $44,346 benefit to the state. According to Dr. Henry Levin, an expert in the economic consequences of inadequate education, these numbers present a clear choice between investing in education now and facing heavier debt in the future. As of now, "Colorado is trading off short run budget savings for potentially much larger long run economic burdens."

¶ 59 Having reviewed the extensive record in this case, I reach a conclusion that is, in my view, inescapable: Colorado's method of financing public education is not rationally related to providing the thorough and uniform education guaranteed by the Education Clause of the Colorado Constitution. Hence, I would affirm the order of the trial court[2] and respectfully dissent.

---

2. Although not significant to the thrust of this dissent, I note that I would supplement the trial court's order by granting the General Assembly five years to change the finance system so it complies with the Colorado Constitution. *See Lobato I*, 218 P.3d at 363–64; *Evans v. Bd. of Cnty. Comm'rs of El Paso Cnty.*, 482 P.2d 968, 972, 174 Colo. 97, 105 (1971). I would retain jurisdiction over this case to monitor the General Assembly's reforms and ensure compliance with its affirmative constitutional duty. *See McCleary*

## II.

¶ 60 The majority holds that Colorado's public school finance system is rationally related to the thorough and uniform mandate because it "funds a system of free public schools that is of a quality marked by completeness, is comprehensive, and is consistent across the state." Maj. op. ¶ 29. The record belies this conclusion.

¶ 61 Many of Colorado's students lack safe and healthy school buildings. Mary Wickersham, who worked for Governors Ritter and Hickenlooper as an education policy advisor, testified that "the literature was uniform in its finding that [school] facilities had a direct impact on student achievement." A 2010 study found that Colorado's schools needed just under $18 billion in repairs and upgrades. The average school building is nearly 40 years old, and many have architectural problems and inadequate heating, lighting, and plumbing systems. Several witnesses testified to leaking roofs and falling ceiling tiles. The ceiling at the K–12 school in Sanford School District in the San Luis Valley caved in during standardized testing. Two schools in the Greeley area require new roofs. Many of the ceilings in that district are coated with asbestos and when parts of these asbestos-coated ceilings collapse, the school must close entire hallways to conduct air testing. A water main broke under Sheridan High School in the southwest Denver metro area, and the high school is sinking. Former state Speaker of the House Andrew Romanoff reported seeing classrooms where children "had worn a dent in the floorboards around a heater they had to huddle around during the cold of winter." Some schools are infested with mice, bats, or rattlesnakes.

¶ 62 Many schools do not comply with the Americans with Disabilities Act and are largely inaccessible to students with special needs. Keila Barish, a recent graduate of Pueblo West High School, has a form of dwarfism, is three feet tall, and uses a scooter to move from place to place. She could not reach, let alone open, many of the doors at school. She could not reach bathroom sinks to wash her hands. When the elevator was broken, which happened several times a week, she relied on fellow students to carry her to second-floor classrooms.

¶ 63 Students lack books and basic supplies. Schools in Adams County, Boulder, Colorado Springs, Greeley, Pueblo, and rural areas do not have enough textbooks for each student to have one. Some schools allow students to take books home only on a first-come, first-served basis. Other schools employ strict no-take-home policies because if a student loses or damages a book, they do not have money to replace it. Like many teachers who testified, Anastasia Campbell, a teacher at Nikola Tesla High School in Colorado Springs, buys school supplies for her students with her own money. She also collects half-used notebooks and other slightly used supplies for her students. Jefferson High School in Greeley stocks its school library using community donations. In the Boulder Valley School District, Fairview High School has to, in the words of principal Donald L. Stensrud, "choose desks or choose books."

¶ 64 The textbooks that districts do have are often out of date. Kevin Edgar, the superintendent of Sanford, testified that a high school student approached him with a physics book and said, "I'm using the same book you did." Edgar had used that same book as a junior in 1980. Justine Bayles, a teacher at Cortez Middle School in southwestern Colorado, found a student's drawing of an airplane on a picture of the World Trade Center twin towers in a textbook predating the September 11 terrorist attacks. She left the drawing in the book as an "update." The history textbooks at Nikola Tesla High School identify Bill Clinton as the current president. In the Boulder Valley School District, the math textbooks are ten years old.

¶ 65 In the opinion of Daniel Maas, a technology expert with the Littleton School District, Colorado's education standards require every student, from 4th grade on, to have access to a computer all day, but many schools lack current technology. Teachers at Sheridan Middle School have an unofficial "try twice" rule to deal with their aging

computers. If they do not boot up on the second try, then the teacher moves on. The school district in Greeley attempts to replace computers on a five-year cycle but has never had the money to do so. Maas testified that meeting the new education standards requires a reliable network and broadband capacity, but many rural districts lack the broadband capacity to stream online classes. In some cases, online classes are students' only opportunity to take a foreign-language or advanced-math class. One school district spent a year on a capital campaign to purchase new computers only to discover that the school's electrical system could not support them.

¶ 66 Students who require additional support, such as ELL students, special education students, and gifted and talented students, do not receive it. At best, Colorado funds two years of English-language instruction despite expert testimony that ELL students need between four and seven years of instruction to become proficient. Several parents testified that their children, who did not speak English when they began school, received only one or two years of English-language instruction and still struggle to speak English in high school. One Aurora high school has one full-time and one part-time teacher to serve about 800 ELL students. In Aurora Public Schools, however, ELL students speak almost 100 different languages. In some schools in Colorado Springs, students speak more than 100. The chief accountability officer for Aurora Public Schools, Lisa Escarcega, testified that, in her expert opinion, no district in Colorado is capable of meeting the needs of its ELL students.

¶ 67 Colorado ranks 51st, or last, among all states and the District of Columbia in state spending on special education students. The reading and math scores for Colorado's special education students have remained flat and are starting to decline. Parents in the Boulder and Denver school districts testified that their special-needs children were shunted from school to school and had to leave programs that were working because the programs were deemed too expensive. One plaintiff was not identified as a special education student until 10th grade, at which time she read at a 2nd-grade level. At first, she received five hours a week of specialized instruction, but her time was reduced to one hour a week in 11th grade and a half-hour a week in 12th grade. Her grades did not improve. She scored an 11 on the ACT,[3] and no Colorado college has accepted her. In Bethune School District in eastern Colorado, counseling sessions were carried out in the lunchroom in front of other students until private space was created in a cleaned-out closet.

¶ 68 Colorado's director for gifted and talented programs, Jacquelin Medina, testified to a lack of funding for gifted and talented programs. Two Boulder elementary schools rely on parent volunteers to help with gifted and talented programming because the schools do not have money to hire enough teachers. Many rural districts do not offer advanced placement classes because they do not have the teachers to teach them. At one rural school, 8th graders identified as gifted and talented in math were given a CD and sent to the library to teach themselves algebra. Taylor Lobato, the named plaintiff in this case, graduated first in her class and was, according to Superintendent George Welsh, one of the best students he had ever seen. Still, as a freshman at the University of Denver, her professors sent her to the grammar center because she lacked grammar skills. Whereas her college roommate received 45 college credits for advanced placement classes she took in high school, Lobato took no advanced placement classes because her district, like many others, could not afford to offer them.

### III.

¶ 69 The majority interprets "thorough" to mean "complete" and "comprehensive" and "uniform" to mean "consistent," holding that

---

3. The ACT, a standardized test that all Colorado students must take, is required by many colleges for admission. In Colorado, the average score is 19. Most colleges require a score in the mid-20s. At the University of Colorado–Boulder, the middle 50% of admitted students scored in the 24–30 range for most majors.

a constitutionally adequate system of free public education is "of a quality marked by completeness, is comprehensive, and is consistent across the state." Maj. op. ¶ 18. For the purposes of this dissent, I need not quarrel with the majority's definition.[4] I agree with the majority that a thorough system of education must be complete and comprehensive—especially insofar as those terms require an education system to be of a certain quality to be constitutionally adequate—and I also agree that a uniform system of education requires some degree of consistency across districts. However, I cannot conclude, as the majority does, that the finance system is rationally related to providing a thorough and uniform education when the record reveals an education system so crippled by underfunding and so marked by gross disparities among districts that access to educational opportunities is determined not by a student's interests or abilities but by where he or she happens to live. In my view, Colorado's constitutional guarantee demands something more.

¶ 70 Colorado could achieve a constitutionally thorough system of education with adequate funding. Colorado could achieve a constitutionally uniform system of education with an equitable method to distribute available funds. Having reviewed the extensive trial record, the Public School Finance Act

(PSFA), and the other funding statutes, I am convinced that Colorado has done neither.

## A. Thorough

¶ 71 Since the inception of the PSFA, the base amount of per-pupil funding has never been determined in relation to the costs necessary to educate Colorado's students. It was born out of political compromise and budgetary wrangling. The PSFA has never been significantly revised. No adjustments have been made to account for Colorado's changing demographics, the increased costs associated with educating Colorado's changing student population, or the increased funds necessary to implement the new state-mandated education standards. The funding provided by the PSFA bears no rational relationship to the actual cost of providing a thorough and uniform education.

¶ 72 The PSFA contains weighted factors that are intended to address disparities in education costs among districts based on cost of living, personnel, size, and the concentration of at-risk students. But, as the majority notes, the PSFA also employs a "negative factor" that reduces each district's total program by a certain percentage. In operation, the negative factor acts as a reduction of other existing factors. It does not affect the base per-pupil amount. Applying the negative factor thus largely counteracts the

4. Other states have interpreted similar constitutional provisions in various ways. See, e.g., Roosevelt Elementary Sch. Dist. No. 66 v. Bishop, 179 Ariz. 233, 877 P.2d 806, 814 (1994) (interpreting "general and uniform" to require a finance system that "provide[s] sufficient funds to educate children on substantially equal terms"); Idaho Sch. for Equal Educ. Opportunity v. Evans, 123 Idaho 573, 850 P.2d 724, 734 (1993) (interpreting "thorough" in light of the legislature's educational standards and concluding that the standards' requirements of school facilities, instructional programs, and textbooks are "consistent with our view of thoroughness"); Abbott v. Burke, 149 N.J. 145, 693 A.2d 417, 425 (1997) (interpreting "thorough and efficient" in light of the legislature's education standards); Robinson v. Cahill, 118 N.J.Super. 223, 287 A.2d 187, 211 (Law Div.1972) (interpreting "thorough" to mean "more than simply adequate or minimal"); DeRolph v. State, 78 Ohio St.3d 193, 677 N.E.2d 733, 741 (1997) (interpreting a "thorough and efficient" system as one in which no school district is "starved for funds" or "lack[s] teachers,

buildings, or equipment"); Pauley v. Kelly, 162 W.Va. 672, 255 S.E.2d 859, 877 (1979) (defining "thorough and efficient" to require, "as best the state of education expertise allows," a system that prepares students for "useful and happy occupations" and "recreation and citizenship"); Campbell Cnty. Sch. Dist. v. State, 907 P.2d 1238, 1258–59 (Wyo.1995) (defining a "thorough and efficient" system of public schools as one marked by completeness and productivity without waste and that is "reasonably sufficient for the appropriate or suitable teaching/education/learning of the state's school age children"). Justice Erickson, in his concurrence in Lujan v. Colorado State Board of Education, adopted the following definition: "A general and uniform system [is] one in which every child in the state has free access to certain minimum and reasonably standardized educational and instructional facilities and opportunities to at least the 12th grade." Lujan, 649 P.2d 1005, 1028 (Colo.1982) (quoting Northshore Sch. Dist. No. 417 v. Kinnear, 84 Wash.2d 685, 530 P.2d 178, 202 (1974)).

weighted factors' purpose of creating differentiated funding for districts that require it.

¶ 73 On its face, use of the negative factor is also an acknowledgement of the General Assembly's conscious choice to underfund public schools. In 2012, the negative factor cut nearly $1 billion from the education budget. All school districts, irrespective of location, size, or student population, have been affected by these cuts. Jefferson County School District, Colorado's largest, has cut its budget by $58 million, closed three schools, and laid off 430 employees. In Colorado Springs, School District 11 has closed nine schools. Aurora Public Schools has cut its budget every year for the last six years. As the majority acknowledges, the negative factor reflects fiscal constraints, not education policy. According to David Hart, chief financial officer of the Denver Public Schools, the negative factor makes it impossible for the General Assembly to honor the "original intent" of the PSFA. The negative factor bears no relationship—let alone a rational one—to the General Assembly's thorough and uniform mandate.

¶ 74 The majority points to categorical funding as a reason that the finance system bears a rational relationship to the thorough and uniform mandate. As the majority notes, categorical funding provides additional funding outside of the PSFA for particular groups of students requiring additional services, such as ELL students, gifted and talented students, and special education students. But the record shows that categorical funding is so inadequate that it fails to serve these students in any meaningful way. State support for ELL students is about $127 per pupil, per year. This funding barely covers the cost of administering the state-mandated Colorado English Language Assessment test, let alone the cost of teaching a child English. Gifted and talented students receive about $150 in additional support. For its financial contribution to special education, Colorado ranks last in the nation. According to Vody Herrmann, formerly with the Colorado Department of Education, this lack of state funding means that school districts are spending "much more in these various programs than what they're receiving in reve-

nue, and that's coming out of their total program funding."

¶ 75 Perhaps most striking, however, is the finance system's method of funding capital construction. Unlike most states, capital construction in Colorado is funded exclusively at the local level. As the majority notes, school districts may contract for bonded indebtedness to fund capital improvements or the construction of new schools. By statute, however, bonded debt is capped at 20% of the district's total assessed property value. For 70 school districts, this means that they cannot raise enough money to build one new K–8 school building. For most others, this means that the districts cannot raise enough money to provide a safe and healthy learning environment for students. In Pueblo School District No. 60, the average age of a school building is over 50 years old. The Sanford school building, which houses all K–12 students, has elevated carbon dioxide levels and high concentrations of mold. The roof is partially collapsed. Several school districts, including Aurora Public Schools and District 11 in Colorado Springs, require hundreds of millions of dollars to address unmet capital needs. Mary Wickersham said it best when she testified: "I don't see a logical interpretation of a thorough and uniform system of free public schools that doesn't include schools."

## B. Uniform

¶ 76 Students at Vail's Battle Mountain High School enjoy state-of-the-art video editing labs, a culinary arts studio, and top-end Apple computers. Students at schools in the San Luis Valley attend buildings with crumbling foundations, partially collapsed roofs, caved-in ceilings, ancient heating systems, and inadequate plumbing. Some of these students receive only 40 minutes of computer time per week. Some computers still in use only take 5½-inch floppy disks. Taylor Lobato testified that, at Center High School, a single webpage took 20 minutes to load during an online assessment test. Former state Representative Jack Pommer testified that, under the current finance system, there are "some districts that could build educational palaces, and others that couldn't repair their

roofs." In his words, "that clearly wasn't uniform."

¶ 77 Along with only a handful of other states, Colorado employs a regressive finance system, meaning districts with higher concentrations of poverty receive less funding. According to Dr. Bruce Baker, an expert in Colorado school finance, this problem is "built into the way the weighting scheme is structured." In one national study, Colorado received a "D" for "funding fairness" because per-pupil state and local revenues decrease as district poverty rates increase. Because districts with higher concentrations of poverty typically have higher education costs, districts with low property values get trapped in a cycle of poverty from which there is little opportunity to free themselves.

¶ 78 As the majority notes, the PSFA allows school districts to raise additional funding by asking their electorates to approve a "mill levy override" for education purposes. However, because the amount of funding generated by a mill levy override is tied to local property values, districts with higher property values will always generate more money per mill than districts with lower property values. To generate revenues comparable to those generated by wealthier districts, districts with lower property values must assess more mills and, in effect, tax themselves at higher rates to generate less money. According to former state Senator Susan Windels, "one district could pass a mill ... and raise a million dollars and another district coming from a poor rural area could raise a mill and raise $13,000." Because a district's ability to raise additional mills is capped by statute, the inherent inequity built into the system will continue to exist. Districts willing to tax themselves at higher rates are statutorily prohibited from doing so.

¶ 79 Like the mill levy override, the finance system's method of funding capital construction not only exacerbates massive disparities among districts—it creates them. As noted, the finance system caps a district's ability to contract for bonded indebtedness at 20% of assessed property value. Thus, the total amount of capital funds a district is permitted to raise is purely a function of the district's property wealth. This means that, in Aspen School District, the per-pupil assessed property value is more than $1 million. In Sanford School District, in the San Luis Valley, the per-pupil assessed property value is less than $20,000. In operation, this means that the wealthiest district can raise $219,000 per pupil and the poorest only $1,100—a difference of nearly 20,000%. In Colorado, where affluent resort communities and counties with some of the highest poverty rates in the nation co-exist, a finance system that funds capital construction based entirely on assessed property values, in Mary Wickersham's words, "drives a lot of inequities across the state." Under any conceivable definition of "uniform," a 20,000% disparity among districts in ability to fund capital construction rises to the level of a constitutional violation.

¶ 80 For the reasons stated, I respectfully dissent.

I am authorized to state that Justice HOBBS joins in this dissent.

Justice HOBBS, dissenting.

¶ 81 I respectfully dissent. I join the Chief Justice's dissent, and I also write separately to address the context, intent, and purpose of the Colorado Constitution's Education Clause. The drafters of the Colorado Constitution entrusted to future generations the critical responsibility of educating each generation of the state's children. They adopted the Education Clause to ensure that each Colorado child has the opportunity to become an educated person equipped to participate in life's many challenges, opportunities, and responsibilities.

¶ 82 The founders did not intend that any area of our state would suffer in the future from substandard and unequal access to educational opportunity. Living in the current complex age requires more, not less, innovative ways to develop fundamental critical-thinking, problem-solving, and content-based skills. Today's learners are tomorrow's doers. Each of us fondly recalls a teacher or coach who inspired the expectations we set for ourselves and our communities. The creation of capable and conducive learning envi-

**1152**

ronments in public school classrooms throughout the state is the foundational principle of the Education Clause.

¶ 83 Yet, as Chief Justice Bender adeptly explains, based on the extensive trial record in this case, the current finance scheme for public school education through the twelfth grade does not promote a "thorough and uniform" system, contrary to the Education Clause. Instead, the currently unbalanced system of school finance systematically maintains and exacerbates educational deficiencies—leaving our public school system "so crippled by underfunding and so marked by gross disparities among districts that access to educational opportunities is determined not by a student's interests or abilities but by where he or she happens to live." Dis. op. ¶ 69.

## I. The Education Clause's Mandate

¶ 84 The Education Clause directs the General Assembly to "provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state, wherein all residents of the state, between the ages of six and twenty-one years, may be educated gratuitously." Colo. Const. art. IX, § 2.

¶ 85 The majority relies on *Webster's Third New International Dictionary* to conclude that a "thorough and uniform" system of public education "is of a quality marked by completeness, is comprehensive, and is consistent across the state." Maj. op. ¶ 18. Although completeness, comprehensiveness, and consistency are certainly elements of a thorough and uniform system of public education, these terms alone fail to adequately capture the intent of the framers in regard to the actual operation and effect of the public schools in each generation.

¶ 86 A "thorough" system is one "marked by completeness," as in *"carried through to completion* esp[ecially] with full attention to details" or "marked by attention to many

details, esp[ecially] by sound systematic attention to all aspects and details." *Webster's Third New Int'l Dictionary* 2380 (1971) (emphasis added) (providing the example of a "thorough" course in mathematics). A system is "uniform" when it is "marked by lack of variation, diversity, change in form, manner, *worth,* or degree," "consistent in ... character[ ] *or effect,"* or lacks "variation, deviation, or unequal or dissimilar *operation." Id.* at 2498 (emphasis added). Therefore, I would begin with the presumption that the drafters intended the General Assembly to establish and maintain a system of free public education marked by completeness, comprehensiveness, and consistency in character and effect across the state.[1]

¶ 87 Examination of the "thorough and uniform" mandate must also take into account the context in which the drafters adopted the Education Clause. *See, e.g., People v. Rodriguez,* 112 P.3d 693, 696 (Colo. 2005) ("Our state 'constitution derives its force ... from the people who ratified it, and their understanding of it must control.' " (quoting *Alexander v. People,* 7 Colo. 155, 167, 2 P. 894, 900 (1884))).

¶ 88 In 1859, Colorado experienced a gold rush that initially spawned small settlements of mostly white males, accompanied by few women and children, in mining camps. *See* Edwin Grant Dexter, *A History of Education in the United States* 144 (1919); *see also* State Historical & Natural History Soc'y of Colo., *History of Colorado* 1150 (James H. Baker & LeRoy R. Hafen eds., 1927). "[W]hat few families there were, were ready to set out at a moment's notice for more promising fields, schools were few, and in many instances those that existed were hardly worthy of the name." Dexter, *supra,* at 142.

¶ 89 As farmers arrived to help feed the miners and commerce gave rise to villages, the first school in the Denver area (and,

---

1. *See also Bd. of Educ. of Sch. Dist. No. 1 in City & Cnty. of Denver v. Booth,* 984 P.2d 639, 647–48 (Colo.1999) (consulting *Webster's Third New International Dictionary* to determine the plain meaning of "general supervision" in section 1 of article IX (the "Education Article") of the Colorado Constitution and proceeding to refine this definition in light of evidence of the framers' intent; *see also Prior v. Noland,* 68 Colo. 263, 267, 188 P. 729, 730 (1920) ("The *presumption* is in favor of the natural and popular meaning in which the words are usually understood by the people who have adopted them." (emphasis added)).

likely, the state) opened in a rented room in Auraria on October 3, 1859, and, by October 20, it served twenty students. *See History of Colorado, supra,* at 1150. The following year, Boulder residents constructed the first known schoolhouse in the state; at the time, there were approximately forty children of school age in the immediate vicinity. *See id.* at 1153. "By 1861 ... the number of school children within the boundaries of the entire [Colorado] territory were hardly sufficient, had they been gathered into one district, to have formed a first-class district school." Dexter, *supra,* at 144. That year there were four schools—all private—operating in Denver. *See History of Colorado, supra,* at 1154.

¶ 90 On September 10, 1861, Territorial Governor William Gilpin addressed the first territorial assembly, "dedicat[ing] a significant portion of his speech to a discussion of the 'pre-eminent' importance of education." Tom I. Romero, II, *"Of Greater Value than the Gold of Our Mountains": The Right to Education in Colorado's Nineteenth–Century Constitution,* 83 U. Colo. L.Rev. 781, 819 (2012). Gilpin articulated the widely held "belief that an educated electorate was the strongest safeguard of the nation's republican institutions" and "called upon the legislature to establish schools where all the children of the territory would 'receive generous instruction, *uniform and thorough* in its character.'" *Id.; see also House Journal of the Legislative Assembly of the Territory of Colorado* 10 (1861) (reproducing Gilpin's full speech).

¶ 91 Less than two months later, the legislature authorized "An Act to Establish the Common School System," requiring the territorial superintendent to "see that the school system is, as early as practicable, put into uniform operation." An Act to Establish the Common School System, § 3, *General Laws, Joint Resolutions, Memorials, and Private Acts, Passed at the First Session of the Legislative Assembly of the Territory of Col-*

*orado* 154 (1861). The act provided for a territorial superintendent, county superintendents, education taxes, and a permanent school fund. Colorado's first tax-supported schools opened in Denver in 1862. *See History of Colorado, supra,* at 1155; Junius Henderson, *Colorado: Short Stories of Its Past and Present* 125 (1927). "The significance of this public school legislation[,] enacted but three years after the first discovery of gold in the territory," is hard to overstate:

> Demands for the organization of a stable government, for the establishment of courts of law, for an orderly procedure in the determination of mining rights were insistent and engrossing, yet the vision of these Colorado pioneers was not impaired by the pressure of material things. Not only in breadth of view but in practical provisions for the detailed management of a school system *at once adequate for immediate requirements and flexible for adjustment to the needs of future years,* are evident the sterling qualities of these men and the sound American traditions which they followed.

Henderson, *supra,* at 125–26 (emphasis added).

¶ 92 In practice, Colorado's education system fell well below the mark of "uniform operation" initially envisioned by the territorial legislature,[2] but as the territory's population grew, so did "interest in education," such that "efforts to provide for the extension of the advantages of the public school were everywhere apparent." *History of Colorado, supra,* at 1156; *see also Third Biennial Report of the Superintendent of Public Education of the Territory of Colorado for the Two Years Ending September 30, 1875* 19 (1876) ("There is such a thing attainable in our Public Schools as a *comprehensive, systematic course of education.* There is sufficient time for the average mind to acquire it; but to acquire it, there must be *systematic instruction.*" (emphasis added)).

---

2. For example, in the chaotic environment that preceded statehood, it was not uncommon for county or school district officers to misappropriate, or neglect to raise, school funds. *See* Horace Morrison Hale, Colo. State Teachers' Ass'n, *Education in Colorado: a Brief History of the* *Early Educational Interests of Colorado, Together with the History of the State Teachers' Association, and Short Sketches of Private and Denominational Institutions* 21 (1885); *see also* Dexter, *supra,* at 144 (noting that "school funds were frequently misappropriated" before 1870).

¶ 93 People recognized that the "advantages" of public schooling did not merely accrue to the educated individual but to society at large—an educated citizenry promoted democracy and productivity. *See, e.g.,* Romero, *supra,* at 819; *Second Biennial Report of the Superintendent of Public Education of the Territory of Colorado for the Two Years Ending September 30, 1872, and September 30, 1873* 104–05 (1874) (explaining, in the context of describing the importance of public education, that the "power of the individual, as a part of the whole, to affect the general welfare, arises not merely from his relation as a member of society; he is a witness, a voter, a juryman, he may be a judge, a legislator or an executive"); *First Biennial Report of the Superintendent of Public Education of the Territory of Colorado for the School Years Ending September 30, 1870, and September 30, 1871* 25 (1872) [hereinafter *First Biennial Report*] (stating that "[n]o one familiar with the history of our Republic can doubt that the free school system is the safeguard of our liberties").

¶ 94 Between 1870 and 1880, the percentage of 5- to 19-year-olds enrolled in schools in the United States grew from 48.4 percent to 57.8 percent. *See* Nat'l Ctr. for Educ. Statistics, U.S. Dep't of Educ., *120 Years of American Education: A Statistical Portrait* 14 tbl.2 (1993). Colorado fared better than average, with 65 percent of the new state's school-aged population enrolled in 1876. *See History of Colorado, supra,* at 1156. By 1876, "there were 313 school districts . . . and 219 school houses" which served 14,085 enrolled students within its boundaries. *Id.*

¶ 95 Still, many school-aged children did not attend school regularly. *See First Biennial Report, supra,* at 22. In 1872, the Colorado Territory's Superintendent of Schools worried that "want of regular attendance" greatly hindered "the success of our schools." *Id.* at 15. Although the average length of the public school term during the decade hovered around 130 days nationally,[3] enrolled students attended an average of just 78.4 days of school in 1870 and 81.1 days ten

years later. *See* Dexter, *supra,* tbl. (reproducing a table from the 1902 report of the Federal Commissioner of Education).

¶ 96 Notably, in the run-up to statehood, Colorado's educational leaders expressed a strong desire to avoid sacrificing educational quality for educational quantity. For example, in 1872, the Superintendent of Schools explicitly identified the problem of "[d]istrict officers too frequently employ[ing] teachers of mediocre qualifications, who, 'work cheap,' that thereby the current expenses may be lessened, and they be enabled to continue the school for a longer term." *First Biennial Report, supra,* at 10. Foreshadowing the Education Clause's one-school-for-three-months-per-year requirement for a school district to receive funding, *see* Colo. Const. art. IX, § 2, the Superintendent emphasized that "it is far better that [a] school be taught *but three months [a year]* by a first class teacher, than six months by one unfitted for the position," *First Biennial Report, supra,* at 10 (emphasis added).

¶ 97 Against this backdrop, from late December of 1875 to March of 1876, Colorado held its Constitutional Convention. *See generally Proceedings of the Constitutional Convention Held in Denver, December 20, 1875, to Frame a Constitution for the State of Colorado* (1907) [hereinafter *Proceedings*]. Most of the work of developing constitutional provisions fell to the twenty-four standing committees. *See id.* at 24–25.

¶ 98 On January 5, 1876, the convention referred a multi-part education resolution to the five-member Committee on Education and Educational Institutions. *See Proceedings, supra,* at 43. Among other things, the resolution called for the legislature to "provide for the establishment and maintenance of a *thorough and efficient* system of free schools, whereby all children of the State between the ages of six and twenty-one years, irrespective of color, birthplace or religion, shall be afforded a good common school education." *Id.* (emphasis added). Three

---

3. By comparison, today most states require 180 days of instruction per school year; Colorado requires 160. *See* Educ. Comm. of the States, *Number of Instructional Days/Hours in the School Year* 1, 2 tbl. (2013), http://www.ecs.org/clearinghouse/01/06/68/10668.pdf; *see also* § 22-32–109(1)(n)(I), C.R.S. (2012).

days later, the committee received a resolution requiring "at least one state university" so "[t]hat our public schools shall not only embrace the elementary, but also the higher branches of school education." *Id.* at 84–85. A preamble framed the need for state support of higher education, explaining the state had an interest in ensuring the ongoing availability of effective educational opportunities that progressed according to the demands of the times:

> The nature of our free institutions presupposed a high degree of intelligence of the people, and as the *permanence ... and effectiveness of those institutions become the more secure and productive of good,* the more this intelligence is promoted and spread; and ... [t]he *constant growth* of our common country in number, as well as in its commercial, industrial and political relations, *admonishes us not to neglect to progress according to the demands of our times.*

*Id.* (emphasis added). Although these words did not expressly address elementary education, the principles apply in that context with equal force.

¶ 99 Other state constitutions incorporating an affirmative right to education loomed large in the committee members' minds. Public education had "emerged as an essential issue in responding to important changes in social, political, and economic life for many Americans," and the states responded in kind. While "many of the original states ... scarcely mentioned education in their constitutional documents, between 1800 and the adoption of the Colorado Constitution in 1876, thirty-two out of thirty-seven state constitutions [adopted] (excluding Colorado['s]) contained detailed provisions for education." Romero, *supra,* at 796. The notion that public education is *"essential to republican government"* was "[s]o settled ... that in the late nineteenth century Congress required several territories to create free, nonsectarian public schools as a precondition for statehood." David Tyack & Thomas James, *State Government and American Public Education: Exploring the "Primeval Forest,"* 26 Hist. Educ. Q. 39, 59 (1986) (emphasis add-

ed); *see also Ordinance of 1787: The Northwest Territorial Government,* §§ 13–14, art. III. While most constitutional provisions developed during this time period limited state authority "as a way to correct abuses or to protect against the power of special interests," state education articles reflected "a strong and evolving sense of [affirmative] governmental responsibility" for education. Tyack & James, *supra,* at 48, 53.

¶ 100 Two of the five members of the Colorado Constitutional Convention's Committee on Education and Educational Institutions had previously been high-profile educators in Illinois, which had adopted a constitutional mandate for a *"thorough and efficient"* system of public education a few years earlier. Romero, *supra,* at 803–04, 826–27 (emphasis added). Delegates to the Illinois convention had intended—at minimum—for that state's system of free public schools to provide a general education that would "enable one to perform his duties as a good citizen." 2 *Debates and Proceedings of the Constitutional Convention of the State of Illinois* 1733 (1870). Although they "disagreed over the scope and specific content" of a thorough and efficient system of public education, most Illinois delegates "indicated that some level of education was necessary to achieve societal goals of extending civic education, virtue, and socially desirable skills to all of the state's residents." Romero, *supra,* at 809.

¶ 101 While the contemporaneous record of discussion about education at the Colorado Constitutional Convention is slim,[4] it does reveal that provisions "draw[ing] a sharp distinction between public and private schools" and prohibiting racial, as well as religious, discrimination proved highly controversial. Romero, *supra,* at 828–31; *see also* sources cited therein, *e.g., Constitutional Convention: The Petitions Still Rolling In,* Rocky Mountain News, Feb. 11, 1876, at 3. Nonetheless, the delegates eventually adopted both. *See Proceedings, supra,* at 686–87.

¶ 102 By contrast, the central mandate of the Education Clause appears to have elicited no public debate at the convention.

---

4. *See* Romero, *supra,* at 835 n.266.

Although the committee issued multiple revisions of the Education Article, and the convention at large discussed other proposed language within it, the final phrasing of the "thorough and uniform" mandate— "[t]he General Assembly shall ... provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the State"—appeared in the first proposed version of the article and never varied. *Compare id.* at 185 (reproducing the first committee report's proposed language for the Education Article, with the Education Clause appearing in section 2, as it does today), *with id.* at 686 (reproducing the final Education Article, article IX). Colorado was the first state to incorporate this particular wording into a constitutional mandate for public education. *See* Romero, *supra,* at 833 n.252, 836.[5] We have no record of why the committee chose the phrase "thorough and uniform" over "thorough and efficient" (the original language contained within the resolution the convention initially referred to the committee). However, the broader phrasing indicates that the framers valued maintaining a minimum, uniform level of educational quality throughout the state more highly than streamlining the educational bureaucracy.

¶ 103 Addressing the people of Colorado at the convention's close, the framers summarized the Education Article as "forever guarantee[ing]" the existence and "maintenance of free public schools" for Colorado's children. *Proceedings, supra,* at 727. The full article summary reads as follows:

By the provisions of this article the general supervision of the public schools is vested in a Board of Education.

*The maintenance of free public schools, and the gratuitous instruction therein for all children between the ages of six and twenty-one years, is forever guaranteed.*

It is declared that the public school fund shall forever remain inviolate and intact; that neither the State, nor any county, city, town or school district shall ever make any appropriation, nor pay from any public fund any thing in aid of, or to help support, any school or institution of learning of any kind controlled by any church or sectarian denomination whatsoever; that no religious test shall ever be required as a condition for admission into any of the public schools, either as pupil or teacher; that no religious or sectarian dogmas shall ever be taught in any of the schools under the patronage of the State.

The General Assembly is required to pass suitable laws to husband, to the fullest extent, the several grants of land donated by the General Government to this State for school purposes. *It is provided that the several institutions of learning and charity now fostered by the Territory shall be perpetuated and cared for by the State.*

*Id.* (emphasis added).

¶ 104 Examining the Education Clause in its context reveals that, from the time of the First Territorial Legislature, Coloradans strove to provide a system of free public education directed at achieving an informed and productive populace. This overarching commitment to the goals of education cannot fairly be extricated from the meaning of "thorough and uniform" while maintaining fidelity to the framers' intent. In creating the "thorough and uniform" requirement, the framers intended that the legislature would establish and maintain a complete and comprehensive system of public education that consistently affords Colorado children the opportunity to develop the skills and knowledge necessary to participate fully in the opportunities and challenges of a dynamically growing state.[6]

---

5. At the time of the Colorado Constitutional Convention, the education articles of six states' constitutions included a "thorough and efficient" mandate. *See* Ill. Const. of 1870, art. VIII, § 1; Minn. Const. of 1857, art. VIII, § 3; Neb. Const. of 1866, art. VII, § 1; N.J. Const. of 1844, art. IV, § 7(6) (adding the mandate with the amendments of 1875); Ohio Const. of 1851, art. VI, § 2; W. Va. Const. of 1863, art. X, § 2.

6. This broad standard reflects both deference to the legislature's primary role in providing for the establishment and maintenance of a thorough and uniform system of free public schools and "recognition of the fact that the specific educational inputs or instrumentalities suitable to achieve this minimum level of education may well change over time, as a 'constitutionally adequate public education is not a static concept removed from the demands of an evolving

¶ 105 Far from being satisfied with a bare minimum number of school houses in every school district, the framers staked our state's future on the commitment of each succeeding generation to meeting the educational needs of Coloradans border to border within our boundaries. To this end, the Education Clause mandates that the legislature provide for "establishment and maintenance" of a thorough and uniform system of public schools. "Establishment" of a system is "the act of bringing into existence, creating, founding, originating, or setting up [the system] so that a certain continuance is assured." *Webster's Third New Int'l Dictionary, supra,* at 778. On the other hand, "maintenance" encompasses "the labor of keeping something ... in a state of repair or efficiency" and "the action of preserving or supporting." *Id.* at 1362. Thus, system "maintenance" entails ongoing recognition of—and responsiveness to—the actual condition of the learning environments made available to our children to meet contemporary standards and expectations.[7]

¶ 106 The drafters were acutely aware that the knowledge and skills necessary for citizenship and productive participation in the workforce would change drastically from 1876 onwards. They lived in a rapidly evolving era of great social, political, and technological change. They understood that a thorough and uniform system of public schools could not remain static, divorced from practical realities. They contemplated changing conditions that would shape what maintaining a thorough and uniform system of public education actually requires. Although the

Education Clause itself required the operation of one school in each district, open for at least three months per year, no one can seriously argue that such a system would qualify today as "thorough and uniform" under any definition.[8] Delimiting education to such a "system" would certainly not afford all Colorado children the opportunity to develop the knowledge and skills necessary for citizenship and productive participation in society. More importantly, as implementer of the Education Clause's intent and purpose, the General Assembly has set standards for educational achievement in the public schools throughout the state, while, at the same time, the state has failed to provide the funding necessary to achieve these standards.

## II. The General Assembly's Standards for Public School Education Are Relevant to Construing the Education Clause

¶ 107 The General Assembly's own pronouncements regarding the level of education expected under the Education Clause are relevant to constitutional interpretation. *See, e.g., Lobato v. State (Lobato I),* 218 P.3d 358, 375 (Colo.2009) ("The trial court. may appropriately rely on the legislature's own pronouncements to develop the meaning of a 'thorough and uniform' system of education."); *Owens v. Colo. Cong. of Parents, Teachers & Students,* 92 P.3d 933, 935 (Colo. 2004) (stating that the General Assembly "has significant authority to guide and implement educational policy").

¶ 108 In 1993, the General Assembly adopted H.B. 93-1313 as Part 4 ("Education

---

world.' " *Conn. Coal. for Justice in Educ. Funding, Inc. v. Rell,* 295 Conn. 240, 990 A.2d 206, 255 (2010).

7. As I described above in paragraph 86, the words "thorough" and "uniform," themselves, encompass operation and effect.

8. The framers likely included the secondary mandate for maintenance of "[o]ne or more public schools ... in each school district within the state, at least three months in each year," Colo. Const. art. IX, § 2, to serve several purposes—vitally important at the time—which are, today, subsumed by the Education Clause's primary "thorough and uniform" mandate. First, this mandate avoids the perceived false-economy of requiring school districts to hire mediocre teachers "cheap" for longer periods of time than they

could feasibly afford to pay superior teachers. Furthermore, tying school district fulfillment of the mandate to receipt of state funding functioned as a check on misappropriation of state school funds by local officials in districts not adequately serving the state's youth. In essence, in 1876, a "thorough and uniform" system of public education that provided the requisite opportunity to develop the skills and knowledge necessary to be a good citizen and a productive member of society reasonably contemplated a single school operating three months per year in a school district. However, given the changed circumstances we face in the world today, the primary mandate subsumes the secondary and forms the constitutionally acceptable floor.

Reform") of the Educational Accountability Article (now located at article 7 of Title 22), directing implementation of a standards-based education system. The "ultimate goal," according to the legislature, was "to ensure that Colorado's schools have standards which will enable today's students of all cultural backgrounds to compete in a world economy in the twenty-first century." § 22-7-401, C.R.S. (2012); *see also* § 22-7-403(2), C.R.S. (2012) (declaring that all Colorado residents between six and twenty-one years of age have a fundamental right to education that assures each resident the opportunity to achieve the standards required by the legislation at a performance level "sufficient to allow such resident to become an effective citizen of Colorado and the United States, a productive member of the labor force, and a successful lifelong learner").

¶ 109 In 2008, the General Assembly enacted the Preschool to Postsecondary Education Alignment Act (the "Colorado Achievement Plan for Kids," or "CAP4K") as the "next generation of standards-based education." § 22-7-1002(1)(d), C.R.S. (2012). The legislature declared that, "[f]rom the inception of the nation, public education was intended both to prepare students for the workforce and to prepare them to take their place in society as informed, active citizens who are ready to both participate and lead in citizenship." § 22-7-1002(1)(c), C.R.S. (2012). CAP4K required the state Board of Education and the Colorado Commission on Higher Education to ensure that Colorado's education standards "are sufficiently relevant and rigorous to ensure that each student who receives a public education in Colorado is prepared to compete academically and economically within the state or anywhere in the nation or the world." § 22-7-1002(1)(e), C.R.S. (2012).

¶ 110 In 2009, in order to assure accomplishment of the goals of CAP4K, the General Assembly enacted the Education Accountability Act. The Act expanded on preexisting law by further defining the parameters of an "effective system of statewide education accountability" and emphasizing the importance of "maximizing every student's progress toward postsecondary and workforce readiness and postgraduation success." § 22-11-102(1), (1)(a), C.R.S. (2012).

¶ 111 Thus, the General Assembly has consistently identified the purpose of its educational policies as enabling Colorado students to be effective citizens of Colorado and the United States, productive members of the labor force, and successful lifelong learners. It has plainly recognized what the drafters intended by the phrase "thorough and uniform." [9] It has passed significant legislation establishing a general school-funding formula applicable to all school districts, "categorical" funding for categories of students identified as requiring more financial assistance, and a statutory mechanism for districts to borrow money from their constituents to improve infrastructure or build new schools.

¶ 112 The majority cites the existence of uniformly applicable laws to support its conclusion that the school finance system is thorough and uniform. *See* maj. op. ¶¶ 25–32. However, the Education Clause requires

---

9. Other states have drawn similar conclusions about the meaning of similar constitutional mandates. For example, the Supreme Court of Ohio examined its constitutional education clause, which contains a "thorough and efficient" mandate, and determined

> [t]he operation of the appellant school districts conflicts with the historical notion that the education of our youth is of utmost concern and that Ohio children should be educated adequately so that they are able to participate fully in society. Our state Constitution was drafted with the importance of education in mind.

*DeRolph v. State*, 78 Ohio St.3d 193, 677 N.E.2d 733, 745 (1997) (concluding school funding system violated state constitution); *see also Edge-*

*wood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391, 397 (Tex.1989) (interpreting "an efficient system of public schools" as not allowing concentrations of resources in property-rich school districts and requiring substantially equal access to similar tax revenues per pupil at similar levels of tax effort); *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 211–13 (Ky.1989) (describing an "efficient system of common schools" as one that the state adequately funds to meet specific educational goals; that provides an adequate education with the same opportunities to all children in the state, regardless of place of residence or economic circumstances; and that the state continuously monitors to ensure it meets its constitutional mandate).

more than a thorough and uniform system of *laws*—it mandates "establishment and maintenance of a thorough and uniform system of free public *schools*." Colo. Const. art. IX, § 2 (emphasis added). The record in this case—so well analyzed by the Chief Justice—demonstrates a substantial disconnect between the purported function of the school finance system and its actual operation. Instead of maintaining a thorough and uniform system of public schools, the current system of school finance maintains and exacerbates educational deficiencies. Therefore it is not rationally related to achieving the Education Clause's mandate.

### III. Disparity and Remedy

¶ 113 In *Lobato I*, we determined that the plaintiffs alleged appropriate claims that "the state's public school financing system is unconstitutional because it is underfunded and disburses funds on an irrational and arbitrary basis" and held that, in order to succeed in the lawsuit, the plaintiffs "must demonstrate that the school finance scheme is not rationally related to the constitutional mandate of a 'thorough and uniform' system of public education." 218 P.3d at 374. In my view, the record unequivocally establishes that the plaintiffs met this burden.

¶ 114 Colorado is not achieving the thorough and uniform system of public education our constitution's framers envisioned. The existence of uniformly applicable laws may be necessary, but it is not sufficient, to fulfill the "thorough and uniform" mandate set forth in the Education Clause. The current school finance scheme does not adequately support the General Assembly's standards-based education system.[10] Student performance is declining in important ways while barely holding steady in others; only four states have a lower rate of high school completion than we do, and Colorado's achievement gaps between different demographic groups (based on race and income) are some of the widest in the nation. Dis. op. ¶ 58. The record in this case demonstrates that the quality of education students receive is highly disparate from place to place within our state, with many districts failing to provide students with adequate opportunity to develop the basic knowledge and skills necessary for citizenship and productive participation in society. Property-tax poor districts suffer from being unable to generate sufficient funds to maintain their facilities or achieve the standards the General Assembly has set, leaving them truly "starved for funds." *DeRolph v. State*, 78 Ohio St.3d 193, 677 N.E.2d 733, 775 (1997) (Douglas, J., concurring). In school districts across the state where property values are low, taxpayers should not have to choose between safe school facilities or safe streets, as the majority implies.[11] *See* maj. op. ¶ 38.

¶ 115 For these and the additional reasons set forth in his dissent, I agree with the

10. As an example, the Public School Finance Act attempts to account for a number of variables—such as cost of living, personnel costs, pupil numbers, and at-risk student population—in reaching the "total program" funding level for each school district. However, noticeably absent from this calculation is an explanation of how the base per-pupil funding amount relates to implementing the General Assembly's standards-based system. Since 2006, statewide base per-pupil funding has remained essentially constant (with an annual adjustment for inflation), despite significant changes related to beginning CAP4K implementation. *See* § 22-54-104(5)(a) (XIII)–(XIX) (listing statewide base per-pupil funding for each budget year between 2006–07 and 2010–13); *Analysis of the Costs of Colorado's Achievement Plan for Kids (CAP4K), First Interim Report* 22–25 (2010) (estimating new costs to school districts associated with implementing several components of CAP4K). Even assuming, for the sake of argument, the funding formula used to calculate districts' total programs adequately accounts for the costs they actually face in carrying out state statutory mandates, the "negative factor" pays no heed to that accounting. Instead, this across-the-board reduction slashes every school district's total program by the same percentage in order to balance the state budget. *See* § 22-54-104(5)(g)(II), C.R.S. (2012). Therefore, even if district funding at total program levels would be consistent with the Education Clause's mandate, district funding subject to the negative factor would not be.

11. Although disparities between school districts will always exist, suggesting that local districts have a greater amount of control over their schools by way of bonded indebtedness and mill levy overrides ensures that many Colorado schools will never have funding sufficient to meet the General Assembly's educational mandates or the flexibility to tailor local education to local needs.

Chief Justice that the current school finance system is not rationally related to the Education Clause's mandate for creation and maintenance of a thorough and uniform system of public schools. It is not this court's job to instruct the General Assembly how to fix the system or to pin a dollar amount on a constitutionally permissible alternative. However, through a combination of legislative action, whether by the General Assembly or the voters through referendum or initiative measures, the state should provide each district with the funding necessary to meet the standards the legislature sets for educational achievement. As the record makes clear, it may take years—and significant effort—to reshape the current school finance system into one capable of supporting our rapidly growing and diversifying schools in compliance with the Education Clause's mandate. Colorado should face this critical issue head-on.

¶ 116 Accordingly, I respectfully dissent.

I am authorized to state that Chief Justice BENDER joins in the dissent.